21-1348 Moshe Unger v. City of New York. And Mr. Rickner, you've reserved two minutes for rebuttal? That's correct, Your Honor. Okay, whenever you're ready. Thank you, Your Honor. If it may please the court, Moshe Unger was a teenager, 17 years old, intoxicated in Central in Brooklyn when he was the subject of a blatant anti-Semitic attack. This was, we submit, deliberate indifference. The lower court's opinion is difficult to defend, and in fact, the City of New York does not... Don't you have to point out that prior to the attack, the officers were on notice that there was going to be a substantial risk in the attack? Absolutely, Your Honor. And in fact... And that they were deliberate, they were deliberately indifferent to that. Deliberately. Not that they acted negligently or didn't do enough. Certainly, Your Honor. And in fact, really, if you look to what the district court didn't look at, you can see the gaps here. One Unger was Jewish. He was obviously an Orthodox Jew. Marta ranted anti-Semitic comments for 10 to 15 minutes. The defense, in fact, refers to it as continuous. He testified that Marta was targeting him. He knew that he was the subject of these anti-Semitic statements. They were talking against him, and it wasn't just verbal. There was also a physical component. He was walking back and forth and taking his fist and punctuating his anti-Semitic comments on the wall. Was he in the presence of Mr. Unger when this was happening? Was this not... I mean, my understanding was he was there in a cell and he's across the room when this banging on the wall or what have you happened. I guess I'm asking because it doesn't necessarily suggest either a threat or intimidation towards him, towards Mr. Unger specifically, does it? Well, I believe it does. He was the only person who was as clearly Hasidic as... Mr. Unger was the only obvious Jew in the room. It's a relatively small room. It was 10 or 15 people inside. Was there a holding pen in that idea? There weren't separate cells. There were not separate cells. It's a bit of a holding area. It has benches, a sort of hidden area where the toilet is, three walls that are concrete, and then walls with bars on the front. You said he was the only... What did you say? Obvious Jew? Yes. What made him obvious? Well, he had a yarmulke on. He had earlocks. He was dressed in a traditional Hasidic garb. He had all that? Yes, absolutely. And he understood that this was targeted at him. Now, several instances... Can I just stop you for a second? Didn't he testify that, in fact, he was surprised when the assault actually happened, that it kind of came out of nowhere or there's some kind of language to that effect? And so I don't know if that suggests that he felt that... I mean, I understand that the comments, he understood those to be directed at him. But, again, this idea that there was a threat that was perceived. Right. The attack itself did come out of nowhere. However, there's two points here. One is that Mr. Unger, who was a 17-year-old and very intoxicated by his own testimony, he did not subjectively see the punch coming. But that's not the inquiry. The question is whether the guards did. And I think the second part is that, yes, the attack itself came out of nowhere. But, really, this is about the prelude to an attack. I mean, particularly in incarceration situations, people are... A sneak attack is the way that you attack. You look to attack out of nowhere because that's your best chance of success. So this really isn't about the moment. Doesn't that, though, then cut against the idea that the officers were exhibiting deliberate indifference? If the comments were not articulating a threat and it wasn't, you know, the comments didn't articulate a threat and, in fact, the guards did actually attempt to address it by telling this individual to stop talking and to be quiet, it just seems like the notion that maybe that was not enough is one thing, but to get to the level of deliberate indifference when there was not an articulated threat and when they did, in fact, try to quiet this person at some point. Well, it's not an articulated threat. That's not the standard. The standard is whether or not there's a substantial risk of serious harm. Now, a physical assault, I think everyone has recognized, is a serious harm. No, the standard is whether they were deliberately indifferent to it. That's correct. But they did react. The officers did react. They said, shut up, sit down, be quiet. That's what... It was a guy making noise, banging on the walls, and without a specific threat against your client. Well, it was... And my client testified that the reason he thought the guards were saying that is because Marta was being pretty violent. And the question is a reasonable response, the deliberate indifference inquiry includes. So, if you're saying you did enough, was that reasonable? They didn't move cells. Instead, he ignored them and kept... They had to go in multiple times, and he did not respond to those instructions. If you look at the force context, over and over you see officers saying, I needed to use force because somebody wasn't following my instructions. The fact that Marta didn't follow instructions is evidence that he was, in fact, more dangerous. And the... I think the city has essentially conceded that the officers, or at least that there's circumstantial evidence that the officers knew of each one of these facts I'm describing. Officers went by the cells. The two officers that I've identified, their job was to sit there and watch the monitors and to monitor the cells. And, in fact... But the question is deliberate indifference. Right. Deliberate indifference, not negligence, not carrying out their job poorly. Well... It's deliberate indifference. And at what point were they deliberately indifferent? When they... After multiple times when they told Marta to sit down, and he refused, they should have taken the reasonable step... In other words, they were not deliberately indifferent up to that point, because they were giving him instructions. But at some point, they became deliberately... Yeah. I think a jury could find that at some point prior to the actual punch that these officers became deliberately indifferent. They knew that there's only one Jew in the cell. Anti-Semitic comments that have often been a prelude to violence historically. You have somebody making physical gestures. Yeah. A jury could infer that not only do the officers know all of these things, that a reasonable officer would have looked at this and said, I see a substantial risk here. I see a risk of serious harm. And I have an easy solution. Yandek describes it as a doable thing. You just move somebody to a different cell. In fact, that's exactly what they did after the assault. Counsel, we've seen cases in this court, and I think others as well, where the claim is the officer failed to intervene in an ongoing assault. We've seen those. Correct, Your Honor. Have we had a case where the winning case of failing to intervene in the presence of what is argued to be a threatened or likely assault? I think the answer is yes. Both Lewis and Hayes addressed that situation. When you're talking about failure to intervene, that's typically when there's an ongoing fight and you have to stop a constitutional violation, for example, by another officer. And the question is whether or not there's enough time. I see this as more of a deliberate indifference case. And with those cases, the question is always about the prelude. It's about what they knew leading up to it. Which is your best case of failure to intervene in a threatened assault? I'd say the absolute closest case, in fact, is an en banc decision from the Ninth Circuit called Castro v. County of L.A. That's a case where an intoxicated person was in a cell. Another combative, irritable, intoxicated person was placed in the same cell. An officer, who was actually a volunteer, not even a real officer, goes into the cell and sees one man touching the other man's thigh and reports it. And it was against policy for one person to touch the other person in these cells. And then the next time they come in, the intoxicating person is being kicked in the head. We have no physical contact here until the blow that you're complaining about. That's true, although you have physical contact with the wall, which I submit is a reasonable standard. But there's nothing directed at him. I'm going to get you and kill you. You don't deserve to live. I'm going to beat you up, whatever. It's a very, I mean, going through really the classic slurs of the money-grubbing Jew while pounding the wall with only one obvious target. I mean, Unger saw this as I was the target here. And it's true. We don't have, for example, evidence of him pointing. I'm sorry, as you mentioned this, that he was perceiving this as a threat. He didn't at any time ask the officers to do something, did he? That's correct. And it's not necessary for him to do so. Certainly, had he done so, he might have had a stronger case. But the question is whether, based on what the officers knew, they were deliberately indifferent. There's no requirement that he ask for help. We can't exclude from our thinking the actual attack because that's hindsight. We can't let that inform our thinking. Well, I think that the violence of the attack is circumstantial evidence of the behavior of Marta beforehand. Then we could use hindsight all the time to assess behaviors negligent or otherwise. Not always, but I think that if an attack is particularly severe, that is circumstantial evidence that you would have perceived the prelude to that attack as being severe. And I should also point out, this is exactly the kind of situation where the video would have been crucial. If there's, on the video, Marta pointing at Unger, now I've solved the problem. Now I know that it's being directed. But we don't have the benefit of that because of the way that the magistrate judge and the district court found that there was simply no proof of prejudice. And I submit the kind of questions you're answering could have been answered if we had the video, if we were able to perceive those 10 or 15 minutes in all of the gestures, the number of times that he punched the wall, the intervals between the officers coming in and telling him to shut up, as to whether or not he was making violent gestures towards Unger that maybe Unger, who was intoxicated and periodically asleep, did not see, did not perceive. And that's one of the reasons that, you know, I'm clearly over my time, but the other important issue here is the spoliation. Let me ask you, and maybe the government can answer this, I'm not clear what the video would have actually picked up. I understand that there was no sound in these videos. That's correct. So to the extent that Marta said anything about Unger or about Jews and wasn't being videoed, that would not be picked up. Well, that's correct. You're correct, Your Honor, that audio wouldn't have been picked up. But I think that it's fair to say that video can be just as important in showing the context. You can see somebody's body language. You can see who they're pointing at, whether they're making rapid movements towards somebody. You can see how irate they are. And also, you can just prove that this absolutely happened, that there's not going to be an argument that his jaw was broken some other time. You can see the punch. All of these things are important. And by the way, just to answer your specific question, I realize I skipped over it a bit, the video cameras, the testimony elicit, show that they show the benches, which is where Unger was seated, and which is the area where Marta would have been walking around. You can see the partition into the bathroom area. How close was he to Unger when he was making those earlier? A matter of feet, not particularly. Everything in the cell is a matter of feet. Exactly. Well, they're in a confined room together. And I don't think that there's testimony that he was, when he said one thing, 11 feet away, for example. Although, not to harp on it, that's exactly what the kind of thing that the video would show. The videos also would show the gate area, which is the guards coming in and saying to be quiet. And this is effectively undisputed. If you look on JA-246, you can see the actual findings that Magistrate Judge Scanlon made. And it says, you know, there's a video in every cell. It captures the entire room of the cell. The cameras are pretty good quality. You can usually discern what happens. They film in color. And to really to nitpick and say, well, you don't know if this particular camera was facing the wrong direction or was malfunctioning, that's not necessarily my client's burden. Every piece of evidence elicited at the hearing. It's not. Although, I mean, I think there is a question of having to demonstrate your prejudice from that. But you have some time left on rebuttal. So if you want to wrap up with one or two sentences, then we'll go to your adversary. Thank you, Your Honor. I will keep my two minutes for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. My name is Jeffrey Stannard on behalf of the City Defendants. This Court should affirm the District Court's orders granting summary judgment and denying sanctions. Even taking plaintiff's allegations as true, he cannot prove the defendants failed to protect him under the 14th Amendment. And he can't satisfy either prong of the failure to protect claim. As to the first prong, he can't show that he faced substantial risk of serious harm. He merely alleges that his soon-to-be assailant, Marte, was making offensive, bigoted comments on the opposite side of a jail cell and hitting a wall and then walking over to the plaintiff and punching him, quote, out of nowhere. Do you think that there are, and I guess the question is whether or not the cases show this, or whether you think there are circumstances under which verbal comments can be enough to establish that there's a substantial risk of injury? I think theoretically there is a situation where verbal comments would be enough, but it would have to be a situation like the cases in this circuit where substantial risk was found, where there is a direct threat of violence made to the plaintiff, prior warning to the plaintiff that there's going to be an imminent attack, or something along those lines. Not simply offensive, but nevertheless non-threatening language. And that's important. The language here was non-threatening. And indeed, Marte was not even speaking directly to the plaintiff. On plaintiff's own allegations, he does not allege that he was being spoken to by his assailant. His point seems to be that it's a combination of language, which as you say is non-threatening, but language coupled with violent conduct, even though not directed to the plaintiff. He says the violent conduct is the bang of the wall, which he said was done while saying the offensive remarks. So he's arguing for the combination of remarks and violent, putting them together to add up to a threat of violent conduct towards the plaintiff. Right. I still think that's not enough. Under the particular facts of this case, he was hitting the walls of a jail cell, yes, on plaintiff's allegations, but he wasn't close to the plaintiff. And again, I think maybe if he was making threatening comments, bigoted and threatening comments while hitting a wall, that would be a different question. But here the comments were just non-threatening in nature and were not even being spoken to the plaintiff. Could you be clearer on that? You said they weren't combined. In other words, the hitting of the wall and the non-threatening comments, the anti-Semitic comments were done and that hitting the wall was separate? No. I thought they were together. I think the allegation is that they were happening at the same time. But what I was saying was that it was not a threatening, the comments were not threatening. So while they were offensive and while there was also this physical contact, or you could call it violent contact, punching a wall, conduct punching a wall, I still think the fact that he wasn't talking to the plaintiff and the fact that he was on the opposite side of a jail cell just doesn't rise to the level that is used. What was your response to your adversary's argument that had there been a video preserved here, that it could have helped him because it showed the whole cell and it might have showed him pointing, showed Marta pointing it under, that kind of thing? Yeah, I don't agree with that. As Your Honor pointed out, the video did not have an audio track, so it wouldn't have picked up any of these anti-Semitic comments. It wouldn't have picked up anything that the officers did in response. So the best case scenario for the plaintiff would be that it showed exactly what he said happened minus the audio. So it would have showed- In other words, it would have showed him sort of standing there, maybe saying, visually you could see that he was saying something but we couldn't tell what it was, and then that he banged the wall. Yeah, I think the best case scenario- What if it also showed, though, him repeatedly looking over at Mr. Unger while he was saying these comments? Or just repeatedly looking over at him? Oh, I don't know if that's in the record. I don't know if that was something Mr. Rickner said. Forgive me. I don't believe that there was testimony that he was looking over at him, but I may be wrong about that. But still, that's the extent of what it would show. It would show someone on the opposite side of a jail cell hitting a wall and perhaps looking in the direction of the plaintiff, and then walking up to him and out of nowhere, to use plaintiff's language, punching him out of nowhere. So I believe that the video- What about the officer's response here? How often- did they just tell him once to sit down or shut up? Or was it repeated? I think there was testimony- or plaintiff's allegations are that multiple officers came up to the jail cell and told Marte to sit down and shut up. At different times. That's right. And while plaintiff is arguing that that constitutes an insufficient response because they had to do it multiple times, there's no testimony that the conduct changed at all between those times of telling him to sit down and shut up. So there was no- the conduct wasn't becoming more threatening in nature. It stayed the same. It was still Marte- Doesn't that cut both ways? I mean, their warnings clearly were not affecting any- were not having any effect. And so perhaps that suggests they should have done something more. I'm not sure it does because the conduct was the same. So I don't think the conduct ever- I don't think there's any testimony or plaintiff doesn't allege that the conduct became more threatening in nature, requiring a different response. Yes, they had to ask him multiple times to do it. Perhaps he stopped doing it and then he started again. I think under that circumstance, there was no duty to do something more. Especially because, as pointed out here, Marte- the plaintiff never made any complaint that he was fearing for his safety or anything like that. So multiple officers determined that the proper response to the situation they confronted was to issue verbal commands. And- Perhaps you could remind me or us of what the time span was from the time the officers first maybe told- acted in this case, and then to the time of the punch. Well, the officers themselves don't remember- none of them remember actually coming up to the jail cell and saying that. This is all based on the plaintiff's allegations. So he says that during this 15-minute window, Marte was making these comments, hitting the wall, and that more than one officer came up during that 15-minute period. If this had gone to a jury and they had returned a plaintiff's verdict, do you think we'd then be able to reverse for lack of sufficient evidence? If they had returned the plaintiff's verdict, would you- would this court be able to- And then presumably you would appeal that. Right. So then the question would be, would we reverse for lack of sufficient evidence? I don't think so. I think if this went to a jury, it would be the jury's job to assess the credibility of the plaintiff's allegations. And the video- Well, is it a different standard? In other words, if we couldn't reverse upon a jury's verdict, finding that there was some evidence that persuaded them by a preponderance, then ought we now to give it to a jury? I don't think so, Your Honor. I think- Are they different standards? In other words, is the summary- right now we're on summary judgment, but are you saying if- and you're saying summary judgment was correctly entered. He says it wasn't. If we were to agree with him and it goes to a jury, and then there's a verdict and an appeal that comes to either- to this court, maybe not this panel, but three worthy judges, you'd be arguing there is insufficient evidence to even take it to a jury, wouldn't you? It's essentially the argument you're making now. That's what I'm trying to understand. Do you think it's the same standard after the verdict as before, or are they different? Yes, and- Which? Are they the same or different? I think it would be the same, so we- You think it would be the same. I think it would be the same, and I think that if I understand what Your Honor is getting at, if the video would have made a difference in that analysis, I don't think it would because- No, I wasn't referring to any particular piece of evidence. Okay. Just the procedural context. Okay. Okay, I understand. I mean, if there is- if there's sufficient evidence to get to a jury, then you lose the summary judgment motion. Right. And so you have to argue insufficient evidence to get to a jury based on what's been produced so far, and then assuming that that evidence was the same at the trial, you'd be arguing at the end of the trial that this never should have gone to the jury, or it should have gone to the jury, and then after it goes to the jury that it never should have gone to the jury because the evidence was insufficient for a jury to reach a determination. I see that my time is up briefly. I do think that's correct, Your Honor. Yeah. If there are any further questions, happy to answer them. If not, we ask that the court affirm. Thank you. Thank you very much. The first point I want to make, and I think it's important, is that anti-Semitic slurs are threats. And I think that a jury could look at these anti-Semitic slurs and say, these are close enough to threats. And I could come up with other examples against other groups, and I'm not going to torture the court with that. But, you know, I think there's a vast history here, and a jury can look at that and say, you know what? This wasn't just about cars and money. This is a classic historical threat. Another point I wanted to make is that, you know, the district attorney wanted the video. Now, I wish they had worked harder to get it, and that was their negligence and the city's negligence. But we want the video for the same reason that the DA wants the video. And if you look at Rule 37, the inquiry, and especially when you're considering the prejudice, is the importance to the case. That was the phrase in the advisory committee notes about 37E1. And at least from every client who ever calls me from any facility, you've got to get the video. It's about the video. It's on the video. I saw a camera next to me. And so when you're talking about the case, you're talking about the importance to the case. I don't think you can understate the value of the video. And one of the— Steve, can I just ask you, though, your advisory brought up the idea that what potentially could be shown on the video, that there's nothing that's different from what allegations are already out there in terms of how this occurred, that perhaps, yes, it would show the actual banging on the wall, but for purposes of this, we're accepting that that happened. So what is potentially in the video that actually would contribute to the strength of the case? Well, in some ways, that question places the burden on my client approving what's in the video that's been destroyed, and therefore we can't prove it with the video. I think that my client has some facts. I think it is reasonable to infer from the relatively cursory description that he's able to give. He was the victim of an assault shortly afterwards. As we said, he's intoxicated. This is 10 or 15 minutes, and the question my client is facing is, was this serious enough? And the video really is the answer to that question. My client's own testimony is simply not a perfect substitute, or even in this particular instance, a reasonable substitute. He may not have been looking at Marta every single time. In fact, in this circumstance, I would submit that staring directly at Marta and cataloging everything he's doing would have been particularly dangerous. When you're seeing somebody who's making these kind of comments, what do you do? You look away. You don't necessarily catalog the entire 10 or 15 minutes. So saying that my client's testimony is enough, that he has enough, I just don't believe is fair, and I don't think that it takes into account sort of the broad possibilities for prejudice that the advisory committee offers. The test here is that the city has to act intentionally. You would agree with that, right? Oh, absolutely. We are not in E2 territory. This is E1, which offers substantial remedies but not the case-ending remedies. You know, you don't get to dismiss the complaint, kick out a key defense, things like that, but inferences that a jury could consider that, you know, there would be more, enough to show a substantial risk on the tape, that that could be inferred, that, I think, would be fitting to match the prejudice, because for the E1 context, the question is, what do we do to make the plaintiff whole, rather than the E2, which wanders almost more into punishment? If we accept for argument your point that the remarks can be understood to be a threat, does that get you to a jury, or does deliberate indifference require some extra element beyond just hearing a threat? I would say, well, our case is not just threats, but if you're asking me, I would say that anti-Semitic slurs directed, I think, clearly directed towards one particular individual do rise to the level of a threat. And I was saying, if we accept that, does that get you past summary judgment, or do you need some other fact or reasonable inference to show deliberate indifference to the threat? Well, you would have to show that the officers heard the slurs. That's where the deliberate indifference comes. Well, they did hear the slurs. Right, exactly. So that's where the deliberate indifference comes in. The other side's arguing they were not deliberately indifferent. They told them to shut up, sit down. That's not indifference. That's doing something, but maybe not enough from your perspective, but that's still doing something. Deliberate indifference would have been, presumably, hearing the slurs and then laughing among themselves and walking away. Well, that would certainly be much better evidence in my client's favor, but I would submit that deliberate indifference means seeing this risk, seeing the slurs, and then taking an unreasonable response and repeatedly ignoring chances to just take Marta to a different cell. That is an unreasonable response, and that does get me deliberate indifference. Thank you very much. Thank you.